STATE of Wisconsin, Plaintiff-Respondent,

v.

Jamal L. WILLIAMS, Defendant-Appellant.†

Court of Appeals

*No. 2016AP883–CR. Submitted on briefs March 14, 2017.*
*—Decided June 28, 2017.*

2017 WI App 46

† Petition for Review Filed.

247

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Leon W. Todd*, assistant state public defender of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Jeffrey J. Kassel*, assistant attorney general, and *Brad D. Schimel*, attorney general.

Before Reilly, P.J., Gundrum and Hagedorn, JJ.

¶ 1. GUNDRUM, J. Jamal Williams raises two issues on appeal. He first claims he is entitled to resentencing on the ground that the circuit court sentenced him based on an "improper and irrelevant sentencing factor," "namely, the fact that Williams refused to stipulate to restitution for which he was not legally responsible." Second, he argues the court erred on ex post facto grounds in requiring him to pay a mandatory DNA surcharge.[1] We affirm the court on Williams' first claim, but reverse on the second.

### Background

¶ 2. On April 30, 2013, the State filed a complaint charging Williams and his brother, Tousani Tatum, with felony murder, as parties to a crime. The complaint alleged B.P. and R.W. drove to a marijuana deal B.P. had set up with Williams. Williams and

---

[1] The Honorable Timothy G. Dugan entered the judgment of conviction and sentenced Williams, and the Honorable Ellen E. Brostrom denied Williams' motion for postconviction relief.

Tatum exited their vehicle and met with B.P., who placed a scale on the sidewalk to measure out the marijuana. Tatum placed a gun to B.P.'s head and demanded money and marijuana, causing B.P. to run. Tatum then demanded that R.W., who was in his parked car down the street, give Tatum "his Cartier glasses." Tatum fired at the car, and R.W. died from the gunshot wound. R.W.'s three-year-old child was in the vehicle. According to what Williams told police, when Tatum had earlier entered the vehicle Williams was driving, he possessed a gun and told Williams he was going to rob B.P. Williams also told police he tried to talk Tatum out of robbing B.P., and that after Tatum shot at R.W., he and Tatum ran back to their vehicle and drove away.

¶ 3. The State and Williams reached a plea agreement, pursuant to which Williams pled guilty to an amended charge of felony attempted armed robbery as a party to a crime. At the plea hearing, counsel for Williams expressed as a factual basis for the plea that upon arriving at the location of the planned drug deal, Tatum

> produced a gun and said that he was going to rob the drug dealer. [Williams] at that point knew that a robbery was going to occur, he asked that it not occur, however, he did leave the vehicle and approach [B.P.]
>
> Within that transaction, the gun was used, and after that incident, he ran with the second individual back to the car where he drove the car away aiding . . . [Tatum].

Williams agreed that these facts were accurate, and the court accepted his plea and found him guilty of the amended charge.

¶ 4. The circuit court ordered that a presentence investigation (PSI) be completed. An agent who was

251

already supervising Williams, and thus was familiar with him, interviewed him and prepared a report. Williams told the agent, "I'm the big brother and what I say goes." Williams also expressed that after Tatum fired at the car R.W. was in and they then drove off, the first thing that came to Williams' mind was how they likely had "messed up" his parole. When the agent asked questions of Williams related to R.W.'s death, Williams repeatedly asked, "What does his death have to do with my case? I was convicted of attempted armed robbery." The agent wrote in the PSI that when she "explained the drug deal, armed robbery, and the homicide were all inclusive of the sequence of events of the day, Mr. Williams repeatedly expressed concern about being made to 'look bad.' "

¶ 5. When the agent asked Williams his feelings regarding the offense, his first response was: "I fucked up. I fucked my parole up. My son is out there without his father." Although Williams claimed he was innocent, when queried by the agent, he admitted going to the location to buy drugs and being aware his brother had a gun and planned to rob B.P. Williams said he pled guilty to the amended charge because it was better than going to trial on felony murder, but added, "My case has nothing to do with [R.W.] dying. Nothing related to this case should [be] mixed in with that."

¶ 6. When the agent asked Williams if he had any remorse, Williams indicated he had remorse for his brother Tatum, his mother, and his son. After prompting by the agent, Williams indicated he also had remorse for R.W.'s father and the three year old who was present when R.W., her father, died. When asked what an appropriate sentence would be, Williams responded that he felt he should get "time served and probation."

¶ 7. The report detailed Williams' extensive history of criminal behavior beginning at twelve years old. As the agent went through each item of Williams' criminal record with him, Williams "minimized his behavior in every single arrest, or placed blame on another person." Regarding a 2003 arrest for endangering safety by use of a weapon, Williams "boast[ed] the charge was dropped in court" and "appeared to be proud and seemingly found it humorous how many times charges have been dropped in court." Williams smiled and stated police "wanted to get me on something, but they couldn't. Either they couldn't prove it was me or they did an illegal search or something." When asked if he felt he "just got away with a lot of stuff," Williams shrugged and responded, "Rights are rights, right?" The agent further detailed Williams' "boasting" about other charges against him being dismissed.

¶ 8. Providing her "assessment and impression," the agent wrote that

> [o]nly after being questioned, by this writer repeatedly, did [Williams] even give a brief moment of thought to the victims of this case. Mr. Williams went on and on about how he feels *he* deserves a fair outcome in sentencing . . . . Mr. Williams is stunned to find himself in the current situation, repeatedly illustrating, to this writer, his only concern is for himself . . . .

> Mr. Williams comes off as being very savvy with the criminal justice system . . . . Mr. Williams illustrated a sense of self-centeredness when speaking about the current offense, minimizing the offense, talking in circles, and blaming others of twisting his words. Mr. Williams showed very little remorse for the victims caused by his action . . . .

The agent described Williams as having an "atrocious lack of remorse." The agent further observed that "[a]s the 'big brother' and driver, had Mr. Williams disen-

gaged at any point, [R.W.] likely would not have lost his life in the presence of his young daughter."

¶ 9. At sentencing, the State told the circuit court, "I really don't think there's any remorse here . . . . As the presentence writer indicated, it's mostly about him and what's gonna happen to him." "There's no remorse for what happened here and he's taking no responsibility for [R.W.'s] death." The State requested Williams be ordered to pay $794 in restitution, joint and several with Tatum, related to the funeral costs of R.W., asserting "the homicide was a direct extension of this armed robbery."

¶ 10. Though invited to do so at the sentencing hearing, neither Williams nor his counsel made any relevant corrections to the PSI. Williams' counsel then told the circuit court that Williams had taken responsibility for his actions by pleading. He "disagree[d] strongly" with the State and PSI writer's representations that Williams lacked remorse, stating Williams "expressed to me remorse for everyone involved." Counsel added:

> I guess I take issue that because he is thinking about his brother has thrown away his adult life, his mother and his son that somehow that does not reflect his remorse also for [R.W.'s fiancé], [R.W.'s] father and for [R.W.'s] daughter, and in fact, on page four of the PSI the writer states, "He did have remorse thinking about the little girl who saw her father die [and R.W.'s] father who no longer has a son."

Counsel admitted that Williams, even knowing what Tatum's intentions were, "went along to complete the transaction and this horrible, horrible thing resulted," adding that Williams "is completely aware of the effect that this transaction has had on all the families involved." On the issue of restitution, however, counsel

254

argued that the shooting was not foreseeable and was "a separate transaction" and Williams "should not be held accountable for . . . that $794."

¶ 11. Sentencing Williams, the circuit court stated in relevant part:

> [The] attempt[ed] armed robbery . . . [is] really serious because of the nature of the crime, the outcome in this particular instance and your involvement.
>
> Here you set up a drug deal and your brother came along. You knew your brother had a gun. You knew your brother was going to rob the individual, but instead of stopping, saying no, I'm not going to go along with this, get out of my car, I'm not taking you anywhere, you took him to the scene to commit the robbery, and then you assisted.
>
> You called over to [B.P.] [B.P.] knew of you, and so you didn't just tell him to go away, get away because you're going to get robbed, you participated in the entire robbery, and then your brother shoots and kills [R.W.], and instead of saying what did you do, we can't leave here, we've got to call the police, we've got to address this issue—You didn't know he had died at this point. You didn't call for help for him. As he was driving away he shot him, and there was a little girl in the car and he did nothing. You drove away. That reflects upon your character. It reflects upon your participation in this entire proceeding. You've accepted responsibility in accepting a plea in this case. It was certainly strategic.

The court then discussed Williams' substantial criminal history beginning at age twelve, including the failure of prior efforts to help reform Williams. The court stated, "The only significant periods that you've been without arrest were when you've been incarcerated."

¶ 12. The court then discussed the PSI report and comments by Williams' agent therein. The court noted that the crime Williams committed "is extremely

255

serious. It's had a profound impact on the victims, their families, the community, and, as you noted yourself to the presentence writer, you could have stopped this at any time but you didn't." Turning to restitution, the court stated in part:

> I don't think I have authority to order the restitution. Had you been convicted of the felony murder, party to a crime, certainly yes, but the nature of itself, the nature of the attempt[ed] armed robbery doesn't justify the restitution or give me authority,[2] and I think the fact that you're not willing to join in on that also reflects your lack of remorse under the circumstances, and I'm certainly considering that.

The court sentenced Williams to ten years in prison and seven and one-half years of extended supervision and ordered him to "submit the mandatory DNA sample" and pay "the mandatory surcharge."

¶ 13. Williams filed a postconviction motion raising numerous claims of error. As relevant to this appeal, the postconviction court determined Williams was not entitled to resentencing on the basis of any comments the sentencing court made related to restitution. The court also denied a request by Williams to vacate the DNA surcharge on the basis that he had already provided a DNA sample and been assessed a $250 surcharge in relation to a 2009 felony conviction. Williams appeals.

---

[2] Considering the totality of the record, we seriously question the correctness of the circuit court's conclusion that it did not have the authority to order the requested restitution. *See State v. Tarlo*, 2016 WI App 81, ¶ 6, 372 Wis. 2d 333, 887 N.W.2d 898 (holding that restitution may be ordered if there is " 'a causal nexus' between the 'crime considered at sentencing' and the damage" (citation omitted)). Because there is no appeal of the court's determination in this regard, however, we do not address it.

### *Discussion*

*"Improper / Irrelevant Sentencing Factor"*

¶ 14. Williams asserts he is entitled to resentencing because the circuit court sentenced him more harshly on the basis that he did not stipulate to restitution related to the funeral costs of R.W. Williams' appeal of this issue does not get out of the gate because he has not convinced us the court sentenced him more harshly on this basis.

¶ 15. "A circuit court erroneously exercises its sentencing discretion when it 'actually relies on clearly irrelevant or improper factors.' " *State v. Alexander*, 2015 WI 6, ¶ 17, 360 Wis. 2d 292, 858 N.W.2d 662 (quoting *State v. Harris*, 2010 WI 79, ¶ 66, 326 Wis. 2d 685, 786 N.W.2d 409). As Williams acknowledges, "[a] defendant bears the burden of proving, by clear and convincing evidence, that the sentencing court actually relied on irrelevant or improper factors." *Id.* Despite "the difficulty [a defendant may have] in proving that a sentencing court actually relied on improper factors, . . . requiring a defendant to prove his case 'promotes the policy of finality of judgments and satisfies the purpose of sentence modification, which is the correction of unjust sentences.' " *See id.*, ¶ 20 (quoting *Harris*, 326 Wis. 2d 685, ¶ 34). Williams fails to satisfy his burden.

¶ 16. In *Alexander*, our supreme court stated:

> When a sentencing challenge is grounded in the use of allegedly erroneous information, we look to the circuit court's articulation of its basis for imposing the sentence. In the context of the whole sentencing transcript, we examine first whether the court gave explicit

attention to the allegedly improper factor and second, whether the improper factor "formed part of the basis for the sentence," which could show actual reliance.

*Id.*, ¶ 29 (citation omitted). In the case now before us, the circuit court did give "explicit attention" and recognition to the fact Williams was not stipulating to restitution. Considering "the context of the whole sentencing transcript," *id.*, however, we agree with the postconviction court that this factor did not form part of the basis for Williams' sentence.

¶ 17. Williams asserts the sentencing court "treated . . . as an aggravating factor" the fact that he refused to stipulate to restitution. He points to the sentencing court's comment: "I think the fact that you're not willing to join in on [the restitution] also reflects your lack of remorse under the circumstances, and I'm certainly considering that." We are unconvinced the court's use of the word "that" at the end of this sentence was referring to the court's consideration of Williams' refusal to stipulate to restitution, as Williams insists. Rather, we agree with the postconviction court's conclusion that "that" refers to Williams' lack of remorse, not his refusal to stipulate to restitution, and that the sentencing court was merely noting that his refusal was another example of his lack of remorse.[3] A sentencing court may appropriately con-

---

[3] The postconviction court stated:

The defendant misconstrues the court's comment. The record shows that [the] court considered the defendant's lack of remorse in determining [the] sentence . . . . The court meant that the challenge to the restitution reflected the lack of remorse that the court was already considering. The fact that the defendant did not stipulate to the restitution in no way affected the court's sentence.

sider a defendant's lack of remorse as a factor warranting a more severe sentence. *See State v. Fuerst*, 181 Wis. 2d 903, 915–16, 512 N.W.2d 243 (Ct. App. 1994); *State v. Gallion*, 2004 WI 42, ¶ 43 n.11, 270 Wis. 2d 535, 678 N.W.2d 197.

¶ 18. Prior to sentencing Williams, the sentencing court had reviewed the PSI report by Williams' agent, which provided numerous examples and the agents' overall strong impression of Williams' "atrocious lack of remorse." At the sentencing hearing, the State also pointed to the report and echoed the agent's observations. Williams and his counsel told the court Williams was remorseful, but the court was unconvinced. The court appeared to believe Williams' decision to plead guilty was "certainly strategic," and it noted Williams' long history of criminal activity and the fact that he fled the scene of the crime after Tatum had fired at R.W., rather than seeing if R.W. was alright. The court further noted:

> The presentence writer comments that you minimized your behavior in all of your arrests, placed blame on others, that you were proud and seemed fond of how humorous it is the times you're charged and then the cases are dropped, and when asked if you feel that you got away with a lot of stuff, you said, "Rights are rights, right?"

The court added that the agent was

> somebody who has worked with you, was hopefully thinking that you were turning your life around— notes that you aren't remorseful, that your focus is upon you, your family, your brother [Tatum].
>
> You believe your brother was unfairly treated and that you suggest a fair sentence would include time served and probation as fair punishment, that although a family lost their son and a father, you don't know how sending you to prison is going to make that any better.

¶ 19. It is apparent the sentencing court was already thoroughly convinced Williams lacked any serious remorse for his actions related to this case or his criminal past when the court stated: "I think the fact that you're not willing to join in on [the restitution] *also reflects* your lack of remorse under the circumstances, and I'm certainly considering that." (Emphasis added.) While Williams contends the court sentenced him more harshly than it otherwise would have due to his failure to stipulate to restitution, we are unconvinced. The totality of the record shows that the explicit attention the sentencing court gave to the restitution issue was for the purpose of agreeing with the position of Williams' counsel that the court did not have authority to order restitution in this case because Williams pled to attempted armed robbery instead of the original felony murder charge:

> I don't think I have authority to order the restitution. Had you been convicted of the felony murder, party to a crime, certainly yes, but the nature of itself, the nature of the attempt[ed] armed robbery doesn't justify the restitution or give me authority, and I think the fact that you're not willing to join in on that also reflects your lack of remorse under the circumstances, and I'm certainly considering that.

The record does indicate the court was "certainly considering" Williams' lack of remorse and likely sentenced Williams more harshly due to this lack of remorse— again, a legitimate basis for a harsher sentence. Williams has failed to convince us, however, that his failure to stipulate to restitution "formed part of the basis for" the sentence.[4] *See Alexander*, 360 Wis. 2d 292, ¶ 29.

---

[4] Because Williams has failed to convince us his failure to stipulate to restitution "formed part of the basis for" his

*DNA surcharge*

¶ 20. Williams also challenges the sentencing court's order that he pay a mandatory $250 DNA surcharge. He argues that because he had been "ordered to provide a DNA sample and pay the surcharge in a prior case," "retroactive application" of the mandatory DNA surcharge statute in this case constitutes a violation of the ex post facto clauses of our state and federal constitutions.

¶ 21. "Whether a statute violates the ex post facto clause is a question of law that we review de novo." *State v. Elward*, 2015 WI App 51, ¶ 5, 363 Wis. 2d 628, 866 N.W.2d 756. As relevant here, a law may violate the ex post facto clause if it makes mandatory a punishment that was merely discretionary at the time a defendant committed a crime. *See Weaver v. Graham*, 450 U.S. 24, 32 n.17 (1981); *Lindsey v. Washington*, 301 U.S. 397, 400 (1937). Because Williams claims the statute is unconstitutional "as applied" to him, we consider the facts of this specific case. *See Blake v. Jossart*, 2016 WI 57, ¶ 26, 370

sentence, we need not fully address the State's alternative contention that even "if the circuit court erred when it considered Williams' objection to paying restitution as an indication of his lack of remorse, that error was harmless. *See Hegwood v. Town of Eagle Zoning Bd. Of Appeals*, 2013 WI App 118, ¶ 1 n.1, 351 Wis. 2d 196, 839 N.W.2d 111 (we need not address other issues when one is dispositive). That said, we are convinced the sentencing court would have imposed the same sentence in this case even if it had never considered Williams' failure to stipulate to restitution. *See State v. Travis*, 2013 WI 38, ¶ 73, 347 Wis. 2d 142, 832 N.W.2d 491 ("The State can meet its burden to prove harmless error by demonstrating that the sentencing court would have imposed the same sentence absent the error.").

Wis. 2d 1, 884 N.W.2d 484. If we conclude the law actually violates his rights, "then the operation of the law is void" as to him. *Id.* (citation omitted). In this case, we are compelled by our precedent to conclude that an ex post facto violation has occurred.

¶ 22. Some background regarding 2013 Wis. Act 20, which created the statutes at issue in this case, is helpful. Prior to the enactment of Act 20, circuit courts did not have the authority, with very minimal exception, to require a person convicted of only misdemeanor offenses to provide a DNA sample or pay a DNA surcharge. *See* 2013 Wis. Act 20, §§ 2355–6, 9426; Wis. Stat. §§ 973.046(13), 973.047(1f) (2011–12);[5] *Elward*, 363 Wis. 2d 628, ¶ 7. A circuit court was required to order a person convicted of a felony to provide a DNA sample; however, the court had discretion[6] as to whether to order the person to pay a single $250 DNA surcharge regardless of the number of felony convictions. *See* § 973.046(1g) (2011–12); *see also State v. Radaj*, 2015 WI App 50, ¶ 8, 363 Wis. 2d 633, 866 N.W.2d 758. With the enactment of Act 20, courts now are required to order at sentencing that anyone convicted of a misdemeanor or a felony provide a DNA sample. Sec. 973.047(1f). Courts are required to impose a $250 DNA surcharge for each felony conviction, Wis. Stat. § 973.046(1r)(a), and while courts also are required to impose a $200 surcharge for each misdemeanor conviction beginning January 1, 2014,

---

[5] All references to the Wisconsin Statutes are to the 2015–16 version unless otherwise noted.

[6] The circuit court had discretion to order payment of the DNA surcharge except as to violations of certain statutes. Wis. Stat. § 973.046(1r) (2009–10) (mandating a DNA surcharge for violations of Wis. Stat. §§ 940.225, 948.02(1) or (2), 948.025, 948.085).

§ 973.046(1r)(b), Act 20 did not allow for the collection of a DNA sample for misdemeanors until April 1, 2015. *See* 2013 Wis. Act 20, § 9426(1)(am), (bm); *Elward*, 363 Wis. 2d 628, ¶ 2.

¶ 23. Our decisions in *Elward* and *Radaj* drive our decision here. In *Elward*, we observed that because of how 2013 Wis. Act 20 was structured

> [w]hen the circuit court sentenced Elward [on January 14, 2014, for a misdemeanor conviction], the law required the surcharge, but did not permit the State to actually collect a DNA sample. As a result, the $200 surcharge bore no relation to the cost of a DNA test because he never had to submit to a test.

*Elward*, 363 Wis. 2d 628, ¶ 7 (citations omitted). "[T]he surcharge was disassociated from its purpose of financially supporting the DNA database." *Id.*, ¶ 2. Because "[t]he State received money for nothing," we stated, "[t]his served only to punish Elward without pursuing any type of regulatory goal. Therefore, the surcharge as applied to Elward was a fine, not a fee,"[7] and constituted an ex post facto violation. *Id.*, ¶ 7.

■

¶ 24. In *Radaj*, 363 Wis. 2d 633, ¶¶ 1–3, Radaj committed four felonies prior to the enactment of 2013 Wis. Act 20. At the time he committed the crimes, the

---

[7] In *State v. Scruggs*, 2017 WI 15, 373 Wis. 2d 312, 891 N.W.2d 786, our supreme court recently explained that

> a fine is a punishment for an unlawful act that is a "substitute deterrent for prison time" and "a signal of social disapproval of unlawful behavior." In contrast, a fee (or in this case a "surcharge") is compensation for a service provided to, or alternatively compensation for a cost incurred by, the person charged the fee.

*Id.*, ¶ 21 (quoting *Mueller v. Raemisch*, 740 F.3d 1128, 1133 (7th Cir. 2014)).

circuit court, exercising its discretion, could have imposed upon him a single $250 surcharge for all of his convictions, but by the time of sentencing, following the enactment of Act 20, the law mandated the imposition of a $250 DNA surcharge for each conviction. WIS. STAT. § 973.046(1g), (1r)(a); *Radaj*, 363 Wis. 2d 633, ¶¶ 1, 5, 8. We considered "whether the new surcharge statute, as applied to Radaj, '[was] a nonpunitive civil statute or a punitive criminal statute,' " *Radaj*, 363 Wis. 2d 633, ¶ 12 (citation omitted), and to answer this question, "whether, under Wisconsin's statutory scheme, there is some rational connection between calculating the DNA surcharge *on a per-conviction basis* and the cost of the DNA-analysis-related activities that the surcharge is meant to cover." *Id.*, ¶ 29. Determining "there is no reason to think that the costs associated with analyzing Radaj's DNA sample and undertaking the other DNA-analysis-related activities under [WIS. STAT.] § 165.77 would" increase with the number of convictions, *Radaj*, 363 Wis. 2d 633, ¶ 30, we concluded:

> As is clear from the statutes, the DNA surcharge is used to cover the cost of the DNA "analysis" of the biological specimen that the circuit court must order a defendant to provide at the time the court orders the surcharge. *See* WIS. STAT. §§ 973.046(1r) and 973.047(1f) . . . . [W]e fail to see any link between the initial DNA analysis and the number of convictions.

*Radaj*, 363 Wis. 2d 633, ¶ 31. Thus, we held that the imposition of four $250 DNA surcharges on Radaj, as was required under the new DNA surcharge statute, was "not rationally connected and [was] excessive in relation to the surcharge's intended purpose, and that its effect [was] to serve traditionally punitive aims." *Id.*, ¶ 35. Based on that, we further held "that, on

264

balance, the surcharge has a punitive effect and, therefore, the statute is an unconstitutional ex post facto law as applied to Radaj." *Id. Elward* and *Radaj* then hold that the imposition of a mandatory DNA surcharge constitutes an ex post facto violation if it relates to an offense committed prior to Act 20 taking effect and no DNA-analysis-related activity occurs in relation to the particular conviction for which the surcharge is imposed.[8] *See Elward,* 363 Wis. 2d 628, ¶ 7; *Radaj,* 363 Wis. 2d 633, ¶¶ 9, 31.

¶ 25. When Williams committed the attempted armed robbery in this case, April 25, 2013, the law provided that a circuit court could exercise its discretion in imposing a $250 felony DNA surcharge; it was not mandatory. Wis. Stat. § 973.046(1g) (2011–12). Williams was sentenced after 2013 Wis. Act 20 took effect, requiring the mandatory imposition of a $250 DNA surcharge for every felony conviction. *See* § 973.046(1r). At sentencing, the court ordered Williams to provide a DNA sample and pay a $250 DNA surcharge related to this attempted armed robbery conviction.

■

¶ 26. The record shows that, in relation to a separate felony offense, a judgment of conviction was entered in 2009 requiring Williams to "[p]rovide DNA sample and pay surcharge" of $250. Williams argues he

therefore would not have needed to provide another DNA sample after his conviction in this case. Thus, the mandatory surcharge in this case is not being used to cover the costs of taking a sample from Williams or

---

[8] The fact that no DNA-analysis-related activity occurred in this case distinguishes it from the situation before our supreme court in *Scruggs. See Scruggs,* 373 Wis. 2d 312, ¶ 48; *see also State v. Scruggs,* 2015 WI App 88, ¶ 14, 365 Wis. 2d 568, 872 N.W.2d 146.

entering it into the database, so there is no legitimate "fee" reason for Williams to pay another surcharge.

Williams insists the mandatory surcharge "is simply punitive, as it is not compensating the State for any additional DNA costs that Williams has created." The State concedes there is no DNA-analysis-related activity that has occurred or will occur specifically in relation to Williams' attempted armed robbery conviction in this case.[9] Under these circumstances, based upon our holdings in *Elward* and *Radaj*, the mandatory DNA surcharge, which was not mandatory at the time Williams committed this crime, bears "no relation to the cost of a DNA test because he [did not have] to submit to a test," *see Elward*, 363 Wis. 2d 628, ¶ 7, has resulted in "[t]he State receiv[ing] money for nothing," *see id.*, and is "not rationally connected . . . to the surcharge's intended purpose," *Radaj*, 363 Wis. 2d 633, ¶ 35. Under *Elward* and *Radaj*, the imposition of the mandatory surcharge here "was a fine, not a fee," *Elward*, 363 Wis. 2d 628, ¶ 7, and "on balance . . . has a punitive effect and, therefore, the statute is an unconstitutional ex post facto law" as applied to Williams, *see Radaj*, 363 Wis. 2d 633, ¶ 35.[10]

---

[9] The State acknowledges in its response brief that Williams "does not have to provide a new DNA sample as a result of his conviction in this case."

[10] One could argue that in *Scruggs* our supreme court appeared to approve of our holding in *Radaj* by stating:

> As the court of appeals in this case explained, "since this appeal involves only a single felony conviction, *Radaj* does not control our decision." Unlike *Radaj*, which involved multiple surcharges for multiple felony convictions, this case addresses whether a single DNA surcharge for a single felony conviction is punitive.

*Scruggs*, 373 Wis. 2d 312, ¶ 35 (citation omitted). The *Scruggs* court further noted that the State was not challenging our

¶ 27. Williams asks that we "vacate the portion of the judgment of conviction that requires him to pay a $250 DNA surcharge." We decline to do so, and instead follow the procedure we employed in *Radaj* and remand this case with directions "that the circuit court apply the surcharge statute that was in effect when [Williams] committed [the crime in this case]. Under that statute, the circuit court exercises discretion to determine whether [Williams] should be assessed a $250 DNA surcharge." *See* WIS. STAT. § 973.046(1g) (2011–12); *Radaj*, 363 Wis. 2d 633, ¶ 38; *State v. Cherry*, 2008 WI App 80, ¶ 5, 312 Wis. 2d 203, 752 N.W.2d 393.[11]

*By the Court.*—Judgment affirmed in part, reversed in part; order reversed and cause remanded for further proceedings.

¶ 28. HAGEDORN, J. (*concurring*). The majority opinion is a correct reading and application of the law

holding in *Elward*. *Scruggs*, 373 Wis. 2d 312, ¶ 35 n.8. While we believe *Elward* and *Radaj* were wrongly decided in that we are unconvinced the DNA surcharge constitutes punishment —even where a surcharge is required when no directly corresponding DNA sample is required—"only the supreme court . . . has the power to overrule, modify or withdraw language from a published opinion of the court of appeals." *See Cook v. Cook*, 208 Wis. 2d 166, 189–90, 560 N.W.2d 246 (1997). We are thus bound by *Radaj* and *Elward*.

[11] We note that it is not clear from the record if Williams ever actually paid the $250 DNA surcharge ordered in relation to his 2009 conviction. *See State v. Jones*, 2004 WI App 212, ¶¶ 2, 7, 11, 277 Wis. 2d 234, 689 N.W.2d 917 (where we determined the circuit court did not erroneously exercise its discretion in declining to vacate a $250 surcharge because the defendant had not demonstrated he had actually *paid* a surcharge related to a surcharge order in a prior case).

governing this case. I join it in full. I write separately to express my view that *State v. Elward*, 2015 WI App 51, 363 Wis. 2d 628, 866 N.W.2d 756, and *State v. Radaj*, 2015 WI App 50, 363 Wis. 2d 633, 866 N.W.2d 758, were wrongly decided, and to urge the Wisconsin Supreme Court to take this case and bring clarity and certainty to this area of law.

¶ 29. 2013 Wis. Act 20, the state budget bill, dramatically expanded DNA collection in Wisconsin. Previously, only those convicted of felonies and certain misdemeanors were required to provide a DNA sample. WIS. STAT. § 973.047(1f) (2011–12). And only those convicted of certain sex crimes were required to pay one $250 surcharge to support the DNA databank. WIS. STAT. § 973.046(1r) (2011–12). The surcharge for other felony offenders was within the circuit court's discretion. Sec. 973.046(1g). In 2013 Wis. Act 20, the legislature chose to require DNA samples from a vast new audience—all those *arrested* for felonies (including juveniles committing acts that would be felonies), and all those convicted of misdemeanors. *See* 2013 Wis. Act 20, §§ 2343, 2356.

¶ 30. Such an expansion of the databank would no doubt cost millions of dollars.[1] To pay for this, the legislature added a new surcharge of $200 per misdemeanor and $250 per felony conviction. *See* 2013 Wis. Act 20, §§ 2354–55. These surcharge fees apply no matter whether an individual has submitted a sample or not. Additionally, all surcharges are now mandatory,

[12] *See* Mary Spicuzza, *Scott Walker proposes increased DNA sampling as part of $14M budget boost for law enforcement*, WIS. STATE JOURNAL (Feb. 13, 2013), http://host.madison.com/wsj/news/local/govt-and-politics/scott-walker-proposes-increased-dna-sampling-as-part-of-m/article_de2f0536–7530–11 e2–920d-001a4bcf887a.html.

not discretionary. *Id.* The surcharge also applies per conviction; no longer is it per case. *Id.* Moreover, the per felony surcharge applies only to those convicted of their crimes, though again, the sample is required of all arrested for felonious acts. *See* 2013 Wis. Act 20, §§ 2343, 2355.

¶ 31. While the merits and constitutionality of this expanded DNA collection scheme were considered, debated, and adjudicated,[2] the reasons for Wisconsin's dramatic expansion of DNA collection are not mysterious. In a January 2013 column advocating for the change, then-Attorney General J.B. Van Hollen explained "several important purposes":

> First, it helps law enforcement and prosecutors efficiently and successfully investigate and prosecute crimes that may otherwise go unsolved. Second, it increases the likelihood that law enforcement can identify perpetrators of previously unsolved crimes and apprehend them before they commit future crimes. Third, including arrestee DNA in the data bank has the potential to exonerate innocent persons wrongfully charged or convicted of certain crimes. Fourth, DNA collection at arrest will substantially enhance the ability of law enforcement to accurately identify persons in custody.[3]

¶ 32. Thus, from the very beginning, the expanded DNA databank—and the surcharges supporting it—had purposes far broader than collection and

---

[2] *See Maryland v. King*, 133 S. Ct. 1958, 1968, 1980 (2013) (holding that a similar Maryland law allowing DNA collection from arrestees did not violate the Fourth Amendment).

[3] J.B. Van Hollen, *J.B. Van Hollen: DNA collection at arrest is vital tool,* THE CAP TIMES (Jan. 11, 2013), http://host.madison.com/ct/news/opinion/column/j-b-van-hollen-dna-collection-at-arrest-is-vital/article_ff16fe00–5 b56–11e2– ad91–0019bb2963f4.html.

269

analysis of DNA samples. The DNA databank is a broad criminal justice tool used to solve old crimes, exonerate the innocent, and rule in and rule out suspects in criminal investigations. Similarly, the funding mechanism for this is, on its face, not directly connected to the gathering and analysis of samples. It does not charge all who submit samples, only those convicted. And it provides that repeat offenders who may have already submitted samples will need to pay anyway. In short, the surcharge is plainly designed to function as a sort of tax on convicted criminals for use of the criminal justice system in support of broad public safety goals—goals far beyond any individual defendant and their DNA.

¶ 33. Many object to this way of funding basic public safety services. But those policy arguments are irrelevant to the legal question here. What is relevant is that Wisconsin's DNA surcharge is not unique—not at all. In fact, the statute books are filled with charges and fees and surcharges that are not denominated criminal fines, yet are assessed against convicted criminals or those subject to civil forfeitures. Some fill the general funds of the state or county; others go to specific causes. Here are a few examples:

- A child pornography surcharge of $500 per image which goes to the Department of Justice (DOJ) to fund investigations of sexual assaults against children and grants for sexual assault victim services. WIS. STAT. § 973.042.

- A bisphenol A (BPA) enforcement surcharge, which adds fifty percent to the normal fine or forfeiture.

Wis. Stat. § 100.335(7).[4] All of these funds go the Department of Agriculture, Trade, and Consumer Protection to fund enforcement of BPA prohibitions.

- A crime lab and drug law enforcement surcharge of thirteen dollars per count that applies when the court imposes a sentence, places a person on probation, or imposes a forfeiture. These funds also go to DOJ to fund drug law enforcement, crime labs, and other services. Wis. Stat. § 165.755.

- The crime prevention funding board surcharge allows counties to impose a fine of twenty dollars per count to help fund crime prevention funding boards. Wis. Stat. § 973.0455.

- The domestic abuse surcharge under Wis. Stat. § 973.055 of $100 per count for conviction of certain crimes. All funds go to the Department of Health Services to fund grants to domestic abuse service organizations.

- The driver improvement program surcharge, which costs offenders $435 per case, when the court imposes a fine or forfeiture for OWI-related offenses. Wis. Stat. § 346.655. Counties receive 50.3% of these fees for alcohol treatment services (or to tribal facilities, if applicable). The Department of Administration (DOA) receives 49.7% of the remaining funds. *Id.*

- Those convicted of certain drug fines must also pay the drug abuse program improvement surcharge of seventy-five percent of the penalty—all of which go to the Division of Hearings & Appeals to fund drug-abuse-related programming. Wis. Stat. § 961.41(5)(a).

---

[4] Jail is one of the potential consequences for manufacturing or selling a child's container that contains BPA. Wis. Stat. § 100.335(2), (4)(b).

- The drug offender diversion surcharge adds ten dollars for each conviction for those sentenced or placed on probation for property crimes under Wis. Stat. ch. 943. These funds go to counties for drug offender programming. Wis. Stat. § 973.043.

- GPS tracking via the Department of Corrections (DOC) receives financial support in the form of a $200 per count surcharge (the global positioning system tracking surcharge) imposed on those convicted of a temporary restraining order, injunction, or other violation under Wis. Stat. §§ 813.12 or 813.125. Wis. Stat. § 973.057.

- The ignition interlock surcharge goes to the county treasury. This fifty dollar surcharge is paid when a court enters an order under Wis. Stat. § 343.301(1g) relating to OWI violations. Sec. 343.301(5).

- Our county jails are funded in part by a jail surcharge of one percent of a fine or forfeiture, or ten dollars per count, whichever is greater. Wis. Stat. § 302.46(1).

- Under the juvenile delinquency victim and witness surcharge, DOJ receives twenty dollars per case when juveniles are adjudicated delinquent to fund victim and witness services. Wis. Stat. § 938.34(8d).

- The penalty surcharge funds DOJ law enforcement training activities via a twenty-six percent surcharge on most fine or forfeitures. Wis. Stat. § 757.05.

- Those paying restitution under Wis. Stat. § 973.20(1r) must pay an additional ten percent restitution surcharge, monies which go straight to counties. Wis. Stat. § 973.06(1)(g). Where DOC or the clerk of circuit court is responsible for transferring restitution to the appropriate person or victim, an additional five percent surcharge is assessed to

272

compensate DOC or the clerk for its administrative expenses. Sec. 973.20(11)(a).

- OWI-related offenders must, in addition to all other fines and surcharges, pay fifty dollars per case, all of which goes to DOA to fund the safe ride program. WIS. STAT. § 346.657(1).

- The crime victim and witness surcharge costs offenders sixty-seven dollars per count for misdemeanors and ninety-two dollars per count for felonies; the surcharge funds DOJ victim and witness services. WIS. STAT. § 973.045(1)(a)-(b).

¶ 34. While one might wonder if all of this is a good idea, this partial listing of additional assessments paid by those subject to the state's power helps us squarely see this fact: significant components of the state justice system and programs aimed at keeping people out of it are funded by surcharges different only in detail, not kind, from the DNA surcharge. And the question before us is whether such surcharges constitute an ex post facto law when they are assessed against those who committed their crimes before the particular surcharge existed. The majority gets the answer to this question exactly right under our precedents. I believe those precedents are wrong, however, and they should be overturned.

¶ 35. Our constitutions—both federal and state —create numerous protections for those on the wrong end of the criminal justice system. Our founders did this precisely because they were worried about a government that could deprive people of life, liberty, and property unjustly. They worried about this because they saw it with their own eyes. As Alexander Hamilton observed, "The creation of crimes after the commission of the fact" had been among "the favorite

and most formidable instruments of tyranny" in times past. THE FEDERALIST No. 84. How could it be right, for example, to punish a person for something that was not a crime when the deed was done, or to punish a person more severely than was authorized when the crime was committed? Such was deemed to be the kind of arbitrary and unjust power that no government had the authority to exercise. This violation of our God-given rights, our founders believed, could not be tolerated. And so, they enshrined an injunction against the imposition of "any ex post facto" law in our charter of liberty.

¶ 36. The test that governs the ex post facto inquiry is well settled in the law.[5] Under the intent-effects test, we first examine the legislative intent of a

[5] Some early cases suggest that the original punishment inquiry was simply whether a given law operated to deprive someone of their life, liberty, or property as a consequence for past misconduct.

In *Cummings v. Missouri*, 71 U.S. 277, 324–25 (1866), the court found that a provision abridging a person's "right to preach as a priest of the Catholic Church, or to teach in any institution of learning" because of previous bad acts violated the Ex Post Facto Clause. The court explained that any "deprivation or suspension" of a person's "inalienable rights" to "life, liberty, and the pursuit of happiness" in response to "past conduct is punishment, and can be in no otherwise defined." *Id.* Notably, the court did not appear to defer to the intent of the enactment in any way—which our current intent-effects inquiry does. The court stated that "[t]he clauses in the Missouri constitution, which are the subject of consideration, do not, in terms, define any crimes, or declare that any punishment shall be inflicted, *but they produce the same result upon the parties,* against whom they are directed, as though the crimes were defined and the punishment was declared. *Id.* at 327 (emphasis added).

The Supreme Court similarly concluded in *Ex parte Garland* that a provision prohibiting a person from practicing

law. *State v. Scruggs*, 2017 WI 15, ¶¶ 16–17, 373 Wis. 2d 312, 891 N.W.2d 786. If the legislative intent is determined to be punitive, the inquiry ends and the law is considered punishment. *Id.*, ¶ 16. If the purpose is deemed civil and nonpunitive, however, we consider whether the law "is so punitive in form and effect as to 'transfor[m] what was clearly intended as a civil remedy into a criminal penalty.' "[6] *Id.* (citations omitted).

law was punishment because the deprivation was dependent upon past misconduct. *Ex parte Garland*, 71 U.S. 333, 377–78 (1866). The court explained that "exclusion from any of the professions or any of the ordinary avocations of life for past conduct can be regarded in no other light than as punishment for such conduct." *Id.* at 377. One commentator characterizes the definition of punishment enunciated in these cases as simply "(*a*) a deprivation or suspension that was (*b*) in response to past conduct." Joshua Kaiser, *We Know it When We See It: The Tenuous Line Between "Direct Punishment" and "Collateral Consequences*," 59 How. L.J. 341, 345 (2016).

Were the test before us here more like this query—whether the state is purporting to deprive someone of their liberty or property more so than they could have at the time a crime was committed—it seems to me that all surcharges applied after-the-fact would violate the ex post facto clause. After all, surcharges deprive a criminal of his or her property in a manner largely indistinguishable from a criminal fine. But that is not the test that governs. The intent-effects inquiry is.

[6] In order to determine whether something is so "punitive in effect" as to transform it into criminal punishment, the following, nonexhaustive list of factors are "useful guideposts":

(1) whether [the law in question] involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment-retribution and deterrence; (5) whether the behavior to which [the law] applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned.

" 'Only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Hudson v. United States*, 522 U.S. 93, 100 (1997) (citation omitted). With this test in mind, the DNA surcharge cannot, in its applications presented to our courts thus far, be considered punishment.

¶ 37. The Wisconsin Supreme Court has already found—correctly in my opinion—that the intent of the DNA surcharge is not punitive. *Scruggs*, 373 Wis. 2d 312, ¶ 3. The court explained that the DNA surcharge was "intended to offset the costs associated with the collection and analysis of samples together with the maintenance of the state's DNA databank." *Id.*, ¶ 30. In other words, it is not just about collecting a sample. The surcharge compensates for collection, analysis, *and maintenance* of samples of the databank. This is correct, and I would add that samples are maintained specifically to support all of the aforementioned goals of the expanded DNA databank.

¶ 38. This rationale, in my view, strongly undercuts the reasoning of *Elward* and *Radaj*, both of which base their conclusion on the rational connection between the intent and effects of the law, and in so doing, take a cabined and cramped view of the purpose of the DNA databank.

¶ 39. *Elward*—though limited by its facts to the imposition of a DNA surcharge for misdemeanants at a time when the law did not require a sample—reasons that the DNA surcharge makes no sense if a DNA

*State v. Radaj*, 2015 WI App 50, ¶ 14, 363 Wis. 2d 633, 866 N.W.2d 758 (citation omitted); *see also Hudson v. United States*, 522 U.S. 93, 99 (1997) (describing the factors as "useful guideposts); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963).

276

sample is not being taken. The court concluded that "the $200 surcharge bore no relation to the cost of a DNA test because he never had to submit to a test." *Elward*, 363 Wis. 2d 628, ¶ 7.[7] And therefore, "[t]he State received money for nothing," which only served "to punish Elward without pursuing any type of regulatory goal." *Id.* This seems to conflict with *Scruggs*, which made clear that the fee is aimed at maintenance of the databank, not just sample collection and analysis. It also ignores the broad public safety goals underlying the maintenance of the DNA databank. The surcharge is pointedly not connected to the taking and processing of a sample because the DNA databank does not exist purely for the collection and processing of DNA samples.[8] *Elward* is wrong, and the supreme court should overrule it.

¶ 40. Similarly, *Radaj* suggested there is no rational reason for charging defendants on a per felony basis. *Radaj*, 363 Wis. 2d 633, ¶ 32 ("[W]e can conceive of no reason why such costs would generally increase in proportion to the number of convictions, let alone in direct proportion to the number of convictions."). I disagree. It is perfectly reasonable to say that someone who has committed four felonies should

---

[7] In *State v. Elward*, 2015 WI App 51, ¶ 1, 363 Wis. 2d 628, 866 N.W.2d 756, the State conceded that the statute violated the ex post facto clause, but we "decided to write an opinion anyway" to clarify the law for a potentially large class of defendants.

[8] This was true even before 2013 Wis. Act 20 was passed. In a 2004 case, we rejected a challenge to the payment of a DNA surcharge even though no sample was collected. *State v. Jones*, 2004 WI App 212, 277 Wis. 2d 234, 689 N.W.2d 917. We held, "Nothing in [Wis. Stat.] § 973.046(1g) requires a DNA sample to be collected before the court can order the payment of the surcharge." *Jones*, 277 Wis. 2d 234, ¶ 7.

be assessed at a level (approximately) more commensurate with his or her burden on the criminal justice system. This is particularly true where those arrested for a felony and who submit a sample do not pay for it at all. The legislature has created a user fee, not different in kind from the percentage or other count-based surcharges. *Radaj* is wrong under the intent-effects test, and I urge the supreme court to take this case and overrule it.

¶ 41. To summarize, I see the statute thusly: The DNA databank is a crime-solving, crime-fighting public safety tool. It supports law enforcement investigatory efforts and, in so doing, saves time, money, and resources that might be otherwise devoted. It serves criminal defendants who might be wrongly accused, or even worse, wrongly convicted. In short, the DNA databank was expanded to further support, assist, and improve the administration of criminal justice in the state of Wisconsin. The funding mechanism, then, must be seen in this light. The legislature needed additional funds for this broader cause, and decided to place the burdens not on those necessarily required to give a sample, but on those convicted of crimes. Policy merits aside, it is altogether rational to assess a fee aimed at solving crimes against those who commit them; at the very least, it is no less rational than the multitude of fees and surcharges that work exactly the same way. The conclusions of *Elward* and *Radaj*, on the other hand, wrongly assume that surcharges exist to collect and process and, in the strictest sense, maintain a DNA sample for a given defendant. This narrow view is not supported by the statute itself, nor is it consistent with the test which requires the "clearest proof" that the effects override the legislature's nonpunitive intent.

278

¶ 42. Legislating is not marksmanship. We should not pretend it is. The DNA databank has broad public policy purposes that far exceed the collection and maintenance of a DNA sample. The legislature's funding mechanism, applied retroactively, certainly imposes a greater deprivation of a criminal's property than was authorized at the time the crime was committed. In this respect, it is no different than the surplus of surcharges, assessments, and user fees that currently fund substantial parts of our legal and criminal justice system. Accordingly, it would appear that either all of these deprivations are punishments, or none of them are.

¶ 43. *Scruggs*, *Radaj*, and *Elward* sit in uneasy, unsettled tension. Together, they create all sorts of questions. For example, if someone committed five crimes before 2013 Wis. Act 20 took effect, with four prosecuted in one trial and the fifth prosecuted in a separate proceeding, is the fee $250 or $500? Does it matter when or if they submitted a blood sample? A single, coherent rule is needed, and here, warranted. Application of the mandatory surcharge in accordance with the statute is not, under the facts of *Scruggs*, *Radaj*, *Elward*, or this case, punishment. Under the intent-effects test that governs us, I do not believe Williams has provided the "clearest proof" that the effects of this deprivation on him overrides the civil, nonpunitive intent behind the DNA surcharge the law requires him to pay.

¶ 44. For these reasons, I join the majority opinion, and urge the Wisconsin Supreme Court to consider this case and reverse both this court's opinion and the precedents that bind us.