# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2016AP883-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| | Plaintiff-Respondent-Petitioner, |
| | v. |
| | Jamal L. Williams, |
| | Defendant-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 377 Wis. 2d 247, 900 N.W.2d 310
PDC No: 2017 WI App 46 - Published

| | |
|---|---|
| OPINION FILED: | May 30, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | March 16, 2018 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Timothy G. Dugan and Ellen R. Brostrom |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | ABRAHAMSON, J., concurs (opinion filed). |
| DISSENTED: | |
| NOT PARTICIPATING: | ROGGENSACK, C.J., and A.W. BRADLEY, J., did not participate. |

ATTORNEYS:

For the plaintiff-respondent-petitioner, there were briefs filed and an oral argument by *Sopen B. Shah*, deputy solicitor general, with whom on the briefs were *Brad D. Schimel*, attorney general, and *Misha Tseytlin*, deputy solicitor general.

For the defendant-appellant-petitioner, there were briefs filed and an oral argument by *Christopher P. August*, assistant state public defender.

**2018 WI 59**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2016AP883-CR
(L.C. No. 2013CF2025)

STATE OF WISCONSIN                    :          IN SUPREME COURT

State of Wisconsin,

    Plaintiff-Respondent-Petitioner,

  v.

Jamal L. Williams,

    Defendant-Appellant-Petitioner.

**FILED**

**MAY 30, 2018**

Sheila T. Reiff
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed in part; affirmed in part.*

¶1  REBECCA GRASSL BRADLEY, J.  We review a petition by the State and a cross-petition by Jamal L. Williams challenging the court of appeals' decision, which held: (1) the mandatory $250 DNA surcharge the circuit court ordered Williams to pay violated the Ex Post Facto Clauses of the Wisconsin and United States Constitutions; and (2) the circuit court did not rely on an improper factor when it sentenced Williams.[1]  The State and

---

[1] State v. Williams, 2017 WI App 46, 377 Wis. 2d 247, 900 N.W.2d 310.

Williams each petitioned for review on the issues decided against them.  The State claims the DNA surcharge statute does not violate the Ex Post Facto Clauses and Williams claims the sentencing court improperly increased his sentence because he exercised his right to object to restitution.  We reverse the court of appeals on the DNA surcharge issue and affirm on the sentencing issue.

## I.  BACKGROUND

¶2  In April 2013, victim R.W. died during an attempted armed robbery of victim B.P.  Williams was arrested and told police the following:  Williams arranged to buy marijuana from B.P. and before meeting B.P. for the drug buy, Williams drove his car to pick up his brother, Tousani Tatum.  When Tatum entered Williams' car, Tatum displayed a gun and disclosed his plan to rob B.P.  Williams then drove to the drug-buy location. Williams claims he unsuccessfully attempted to change Tatum's mind about robbing B.P.  B.P. arrived at the drug-buy location in a car driven by R.W., who remained in the car.  Williams and Tatum got out of their car, and Williams called B.P. over. While B.P. began to weigh the correct amount of marijuana, Tatum put his gun to B.P.'s head, demanding his money and drugs.  B.P. broke free and fled, after which Tatum fired into R.W.'s car. Immediately after Tatum fired the shots, Williams and Tatum fled in Williams' car.

¶3  R.W. died from a gunshot wound. R.W.'s three-year-old daughter, who was in the car at the time, was not physically hurt.  Williams and his brother were initially charged as co-

2

defendants with one count of felony murder. The cases were later severed, and in November 2013, the State filed an amended information charging Williams with four counts: (1) first-degree reckless homicide; (2) attempted armed robbery; (3) first-degree recklessly endangering safety——all three as party to a crime; and (4) felon in possession of a firearm. At the time of the incident, Williams was on extended supervision for a prior conviction.

¶4 The State attempted to negotiate a plea with Williams, hoping to get him to testify against his brother. Williams repeatedly rejected all offered plea bargains and insisted on going to trial. Tatum's case was tried first. The jury convicted him of felony murder and felon in possession of a firearm and the circuit court sentenced Tatum to 24 years of initial confinement, followed by 10 years of extended supervision. Shortly thereafter, Williams agreed to plead guilty to the reduced charge of attempted armed robbery as party to a crime. After accepting Williams' plea, the circuit court ordered a presentence investigation report (PSI). The PSI agent met with Williams on February 19, 2014. The report contains four full pages listing Williams' prior record, consisting of 35 entries. The PSI report emphasizes two points: (1) Williams' "atrocious lack of remorse"; and (2) Williams' "very savvy" ability to outsmart the criminal justice system. The PSI writer said Williams "minimized his behavior in every single arrest or placed blame on another person" and cared only about himself. When the agent asked if Williams had any remorse, he answered

3

"most definitely" explaining he felt bad for his own brother, mother, and son——without mentioning the victims at all, until the PSI writer brought them up. Williams objected to discussing the homicide because, according to Williams, R.W.'s death had nothing to do with his conviction for attempted armed robbery.

¶5 The report reflects that Williams' arrests began when he was 12 years old, and "the only significant periods he has had without arrest are when he was incarcerated." The report also discusses Williams' repeated incidents of absconding from supervision, violating the rules, and dishonesty. The writer noted that Williams "appeared to be proud and seemingly found it humorous how many times, charges [against him] have been dropped." The report also points out that even after Williams pled guilty, he was blaming an unknown third person for the shooting in an attempt to exonerate himself and his brother of all responsibility.

¶6 On March 12, 2014, twenty-one days after his meeting with the PSI writer, Williams was sentenced.[2] The prosecutor's remarks focused on: (1) Williams' lack of remorse (stating in part: "There's no remorse for what happened here and he's taking no responsibility for [R.W.'s] death."); (2) his participation in a drug deal with a gun while on extended

---

[2] The Honorable Timothy G. Dugan, Milwaukee County Circuit Court, presiding. The Honorable Ellen R. Brostrom, Milwaukee County Circuit Court, presided over the Machner hearing and signed the final postconviction order. See State v. Machner, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

4

supervision; (3) his criminal record; and (4) the fact that, as the older brother, Williams could have acted to prevent the homicide. The State asked the circuit court to make Williams pay $794 restitution for R.W.'s burial costs, because even though "he wasn't convicted of the homicide," "the homicide was a direct extension of this armed robbery."

¶7 R.W.'s fiancée, the mother of the three-year-old who witnessed R.W.'s death, asked the circuit court to impose the maximum sentence. She explained the devastating and lasting effects the incident had on her daughter and herself.

¶8 Williams' lawyer also focused on remorse, claiming that Williams' remorse for his own family does not mean Williams lacked remorse for the victims. When asked for his position on restitution, Williams' lawyer responded that the shooting was not a foreseeable consequence of the drug deal and should be viewed as "a separate transaction and [Williams] should not be held accountable for that -- that $794."

¶9 In addressing the court, Williams said he was taking full responsibility for his actions, apologized to the victims, and expressed the following:

> I feel bad. I've been feelin' bad for this whole year. For something over a drug deal, somebody lost their life, somebody lost their father, somebody lost their son and somebody lost their grandson. I ain't tryin' to make myself sound better even though I'm -- going to prison, losing my son too, but she lost her father forever. So I just want to apologize to her and her family and the mother and father. I feel remor[s]e for everything I've done.

5

¶10 The circuit court began its sentencing remarks by discussing the three main sentencing factors: (1) nature of the offense; (2) character of the defendant; and (3) community protection.[3] The circuit court:

- explained the extremely serious nature of Williams' crime and how Williams could have prevented R.W.'s death;

- discussed Williams' character and how his decision to leave the scene instead of calling for help reflected poorly on his character;

- observed that although Williams pled guilty, that decision appeared "strategic" since it did not occur until a jury convicted Williams' brother;

- mentioned Williams' numerous contacts with the criminal justice system and how Williams failed to avail himself of its many attempts to help him; and

- noted many of the PSI report's comments about Williams——including his failure to accept responsibility, his delight in frequently avoiding punishment for his criminal acts, his repeated disregard for the rules while on electronic monitoring in the past, and his failure to take the opportunities he was afforded to turn his life around.

¶11 The circuit court found Williams to be "a risk and a danger to the community because of [his] continued conduct and

---

[3] See McCleary v. State, 49 Wis. 2d 263, 274-76, 182 N.W.2d 512 (1971).

6

[his] continued criminal violations." It noted positive aspects of Williams' character such as his high school diploma, ability to read, decision to take some college classes, and self-report of drug avoidance except the "sporadic use of marijuana." The circuit court discussed the COMPAS analysis, which put Williams in "a high risk for general recidivism" and in need of "a high level of supervision."[4] It then commented on the PSI agent's assessment that Williams had no remorse, observing that the agent had been supervising Williams and trying to get him to turn his life around. The circuit court noted:

> You believe your brother was unfairly treated and that you suggest a fair sentence would include time served and probation as fair punishment, that although a family lost their son and a father, you don't know how sending you to prison is going to make that any better.
>
> The crime is extremely serious. It's had a profound impact on the victims, their families, the community, and, as you noted yourself to the [PSI] writer, you could have stopped this at any time but you didn't.
>
> Considering all of those factors, clearly this is a prison sentence. In the circumstance[,] probation would unduly depreciate the seriousness of the offense.

¶12 The circuit court next addressed Williams' rehabilitative needs and the conditions of his extended

---

[4] COMPAS is the acronym for Correctional Offender Management Profiling for Alternative Sanctions. See State v. Loomis, 2016 WI 68, ¶4 n.10, 371 Wis. 2d 235, 881 N.W.2d 749.

supervision. Afterwards, for the first time, the circuit court commented on restitution:

> I don't think I have authority to order restitution. Had you been convicted of the felony murder, party to a crime, certainly yes, but the nature of itself, the nature of the attempt armed robbery doesn't justify the restitution or give me authority, and I think the fact that you're not willing to join in on that also reflects your lack of remorse under the circumstances, and I'm certainly considering that.[5]

¶13 The circuit court imposed the mandatory DNA surcharge, and "all the other mandatory assessments, surcharges and costs" and fees, ordering them "to be paid from 25 percent of any prison funds, [and] upon release to extended supervision convert to a civil judgment." It then advised Williams of the consequences of being convicted of a felony before finally pronouncing the sentence:

> Considering all of those factors and circumstances, the Court is going to sentence you to the State Prison for a period of initial confinement of 10 years, extended supervision of 7.5 years for a total of 17.5 years consecutive to any other sentence.

¶14 In May 2014, Williams filed a motion seeking to vacate the DNA surcharge. His motion was based on the former DNA surcharge statute, which gave circuit courts discretion to impose the surcharge except with respect to certain enumerated

---

[5] We are not convinced that restitution could not be ordered under these circumstances. See State v. Canady, 2000 WI App 87, 234 Wis. 2d 261, 610 N.W.2d 147 (requiring a "causal nexus" between crime and damage). However, because the State forfeited this issue, we do not address it.

8

sex crimes. Williams claimed that because the circuit court failed to exercise any discretion, the DNA surcharge should be vacated. The circuit court denied the motion, ruling that the surcharge was mandatory because Williams was sentenced after the effective date of the new DNA surcharge statute. Wis. Stat. § 973.046 (2013-14).[6]

¶15 Williams then filed a postconviction motion seeking: (1) plea withdrawal based on ineffective assistance of counsel; (2) resentencing because the circuit court relied on Williams declining to stipulate to restitution, a factor Williams considers improper; and (3) removal of the DNA surcharge on the basis that it violated the Ex Post Facto Clauses as applied to him. Ultimately, the circuit court denied Williams' motion in its entirety.

¶16 Williams appealed, raising only the sentencing and DNA surcharge issues. The court of appeals upheld Williams' sentence, concluding that the sentencing court relied on a proper sentencing factor——lack of remorse——and not on Williams' failure to stipulate to restitution. See State v. Williams, 2017 WI App 46, ¶19, 377 Wis. 2d 247, 900 N.W.2d 310. The court of appeals reversed on the DNA surcharge issue, concluding two of its prior decisions, State v. Elward, 2015 WI App 51, 363 Wis. 2d 628, 866 N.W.2d 756, and State v. Radaj, 2015 WI App 50, 363 Wis. 2d 633, 866 N.W.2d 758, required it to remand this

---

[6] All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

issue to the circuit court. <u>Williams</u>, 377 Wis. 2d 247, ¶¶23-26. The court of appeals believed the circuit court should have applied the discretionary DNA surcharge statute in effect when Williams committed his crime, Wis. Stat. § 973.046(1g)(2011-12), rather than the mandatory DNA surcharge statute in effect when Williams was sentenced, Wis. Stat. § 973.046(1r)(2013-14). <u>Williams</u>, 377 Wis. 2d 247, ¶26. The court of appeals agreed with Williams that Wis. Stat. § 973.046(1r), as applied to him, violated the Ex Post Facto Clauses. <u>Williams</u>, 377 Wis. 2d 247, ¶26.

¶17 In a footnote, the court of appeals stated it believed that <u>Elward</u> and <u>Radaj</u> were wrongly decided, but it lacked the authority to overrule these cases. <u>Williams</u>, 377 Wis. 2d 247, ¶26 n.10 (quoting <u>Cook v. Cook</u>, 208 Wis. 2d 166, 189-90, 560 N.W.2d 246 (1997)).

¶18 Judge Brian K. Hagedorn concurred, supporting the court of appeals' final footnote and urging us to overrule <u>Elward</u> and <u>Radaj</u> because both cases "sit in uneasy, unsettled tension" with <u>State v. Scruggs</u>, 2017 WI 15, 373 Wis. 2d 312, 891 N.W.2d 786. <u>Williams</u>, 377 Wis. 2d 247, ¶43 (Hagedorn, J., concurring). In <u>Scruggs</u>, we held that a DNA surcharge is not punishment under the "intent-effects" test set forth in <u>Hudson v. United States</u>, 522 U.S. 93 (1997), and therefore Scruggs failed to prove that the new mandatory DNA surcharge statute violated ex post facto laws. <u>Scruggs</u>, 373 Wis. 2d 312, ¶¶1, 16, 50.

¶19  Both the State and Williams petitioned for review.  We granted both petitions.  Because the State filed its petition first, we treat Williams' petition as the cross-petition.

## II.  DISCUSSION

### A.  State's Petition for Review——DNA Surcharge

¶20  The State asks us to reverse the court of appeals' decision on the DNA surcharge and overturn Elward and Radaj because the mandatory DNA surcharge statute is not punitive in intent or effect; therefore, the State argues, the statute is not an ex post facto law.

### 1.  Standard of Review

¶21  Whether a statute violates the Ex Post Facto Clauses of the Wisconsin and United States Constitutions is a question of law this court reviews de novo.  Scruggs, 373 Wis. 2d 312, ¶12; U.S. Const. art. I, §§ 9-10, cl. 1; Wis. Const. art. I, § 12.[7]  The Ex Post Facto Clauses prohibit enforcement of a statute "which makes more burdensome the punishment for a crime[] after its commission."  Scruggs, 373 Wis. 2d 312, ¶14.  To determine whether a statute is punitive, we apply the "intent-effects" test.  See Hudson, 522 U.S. at 99.

### 2.  Intent

---

[7] Article I, Sections 9 and 10 of the United States Constitution provide:  "No bill of attainder or ex post facto Law shall be passed" and "No state shall . . . pass any . . . ex post facto Law . . . ."  Article 1, Section 12 of the Wisconsin Constitution provides:  "No . . . ex post facto law . . . shall ever be passed . . . ."

11

¶22 The first part of the intent-effects test requires us to examine whether the legislature intended the new mandatory DNA surcharge, Wis. Stat. § 973.046(1r), to be punishment. If the mandatory surcharge is intended to punish, it cannot be applied to defendants who committed crimes prior to its enactment. Just last term, we answered this question in Scruggs. We engaged in a thorough statutory analysis and concluded that the legislature did not intend § 973.046(1r) as punishment. See Scruggs, 373 Wis. 2d 312, ¶¶3, 17-38. Although the facts in Scruggs differ slightly from the facts in Williams' case,[8] our statutory analysis applies equally here. The statutory text imposing the mandatory DNA surcharge evinces no intent to punish. The legislature termed the payment a "surcharge" not a "fine," it drew a distinction between "a fine imposed in a criminal action and a surcharge imposed in that action," and it linked the surcharge to legislation that dramatically increased the number of people required to provide DNA samples to be analyzed, stored, and maintained in the DNA databank. See id., ¶¶17, 21, 23-26.

¶23 The intent of the surcharge is not to punish, but to fund costs associated with the expanded DNA databank. Id., ¶¶24-26, 30. Significantly, the surcharge imposed is not meant to cover the costs associated with collecting and analyzing the

---

[8] Both Scruggs and Williams committed crimes before——but were sentenced after——the effective date of the mandatory DNA surcharge statute. Unlike Scruggs, Williams already submitted a DNA sample in 2009 for a prior conviction.

particular DNA sample from the individual convicted defendant standing before the sentencing court. Indeed, the new law requires every person <u>arrested</u> for a felony to give a DNA sample. <u>See</u> 2013 Wis. Act 20, § 2343; Wis. Stat. §§ 970.02(8), 165.76, 165.84(7)(ab).[9] But, an arrestee is not ordered to pay any DNA surcharge unless he is convicted. <u>See</u> Wis. Stat. § 973.046(1r). The collected surcharges cover costs associated with taking, processing, analyzing, and storing all the DNA samples of those arrested for felonies but not convicted. The surcharges offset costs associated with collection, analysis, and maintenance of all samples. <u>Scruggs</u>, 373 Wis. 2d 312, ¶27 (citing Legis. Fiscal Bureau, <u>DNA Collection at Arrest and the DNA Analysis Surcharge</u>, Paper #410 to J. Comm. on Fin. 2-3, 8 (May 23, 2013)).

### 3. Misapplication of DNA surcharge's purpose in <u>Elward</u> and <u>Radaj</u>

¶24 In considering early DNA surcharge challenges, courts took a narrow view of the legislature's non-punitive intent. Some courts wrongly assumed the imposed surcharge funded only the collection, processing, and maintenance of the specific DNA sample for which the defendant paid the surcharge. In doing so,

---

[9] Wisconsin Stat. § 165.76(1) lists who is required to give a DNA sample. Paragraph (gm) requires a person "arrested for a violent crime, as defined in s. 165.84(7)(ab)" to give a sample. Wisconsin Stat. § 165.84(7)(ab) defines "violent crime" as a felony violation (listing each specific felony statute) as well as the "solicitation, conspiracy, or attempt" to commit the felony violations listed in subsection (7)(ab)1.

they failed to recognize the broader purpose of the expanded DNA databank funded by the mandatory surcharges assessed against convicted defendants:

> The DNA databank is a broad criminal justice tool used to solve old crimes, exonerate the innocent, and rule in and rule out suspects in criminal investigations. Similarly, the funding mechanism for this is, on its face, not directly connected to the gathering and analysis of samples. It does not charge all who submit samples, only those convicted. And it provides that repeat offenders who may have already submitted samples will need to pay anyway. In short, the surcharge is plainly designed to function as a sort of tax on convicted criminals for use of the criminal justice system in support of broad public safety goals——goals far beyond any individual defendant and their DNA.

Williams, 377 Wis. 2d 247, ¶32 (Hagedorn, J., concurring).

¶25 Based on faulty assumptions, courts mistakenly attempted to correlate a particular surcharge with what they thought were the actual costs attributable to a defendant's individual DNA sample. This led courts to declare that Wis. Stat. § 973.046 (2013-14) violated the Ex Post Facto Clauses and vacate DNA surcharges when: (1) DNA samples were not actually being taken, see Elward, 363 Wis. 2d 628, ¶7; and (2) the statute required a defendant convicted of four crimes to pay four separate surcharges, even though he gave only a single DNA sample, see Radaj, 363 Wis. 2d 633, ¶32. Elward and Radaj were wrongly decided, based on erroneous reasoning, and for the reasons explained below, must be overruled.

¶26 Under the mandatory DNA surcharge statute, enacted in 2013 Wis. Act 20, courts sentencing defendants after January 1,

14

2014, were required to impose the mandatory DNA surcharge: $250 for each felony conviction and $200 for each misdemeanor conviction. See Wis. Stat. § 973.046; 2013 Wis. Act 20, § 9426(1)(am). However, the Act did not permit the State to collect DNA samples from convicted misdemeanants until April 1, 2014. See 2013 Wis. Act 20, § 9426(1)(bm).

¶27 Elward involved a defendant who was sentenced between January 1, 2014 and April 1, 2014. The sentencing court imposed the mandatory DNA surcharge, but the court of appeals reversed. 363 Wis. 2d 628, ¶1-2. The court of appeals held the DNA surcharge statute imposed ex post facto punishment for any defendant sentenced for a misdemeanor conviction between January 1, 2014, and April 1, 2014, because these defendants would pay surcharges "to maintain a database of which they could never be a part because they could never be ordered to actually provide a sample." Id., ¶2. The Elward court reasoned:

> As a result, the $200 surcharge bore no relation to the cost of the DNA test because he never had to submit to a test. The State received money for nothing. This served only to punish Elward without pursuing any type of regulatory goal.

Id., ¶7. The court of appeals misunderstood that the $200 surcharge imposed on Elward was not to pay for his own personal DNA sample, but to offset the costs associated with the newly expanded DNA databank and other DNA-related activities within the State.

¶28 The court of appeals in Radaj made a similar error in concluding that the surcharge-per-conviction part of Wisconsin's

15

statute violated the Ex Post Facto Clauses by causing Radaj to pay $250 for each of his four convictions without any link between the surcharge and the actual costs associated with either "analyzing Radaj's" DNA sample or with comparing Radaj's DNA profile to "other biological specimens collected as part of a future investigation." 363 Wis. 2d 633, ¶¶30-32. The Radaj court based its decision in part on the fact that Radaj was not being ordered to provide four separate DNA specimens for testing. Id., ¶32. The Radaj court mistakenly believed the amount of the DNA surcharge must have a rational connection to the actual cost of Radaj's personal DNA sample in order for it to escape classification as punitive. Although a rational connection between the surcharge and a non-punitive purpose is one factor considered in examining whether the surcharge has the effect of punishment (which we examine in the next section), the Radaj court misguidedly limited its discussion to Radaj's specimen specifically instead of the regulatory activities of the DNA database as a whole.

¶29 The non-punitive purpose of the mandatory DNA surcharge statute is not to cover the DNA-analysis-related costs incurred for the specific conviction for which it is being imposed. Rather, the non-punitive purpose is to fund the costs associated with the DNA databank by charging those necessitating its existence——convicted criminals. That means a defendant pays a surcharge for every conviction irrespective of whether his DNA profile already exists in the databank and whether he submits only one DNA sample. This is what the law says. We overrule

16

Elward and Radaj. The reasoning employed in those cases was unsound and the cases were wrongly decided. Because the court of appeals' majority opinion in this matter relied on Elward and Radaj, its holding on the DNA surcharge is faulty and must be reversed. See Johnson Controls, Inc. v. Employers Ins. of Wausau, 2003 WI 108, ¶¶94-100, 264 Wis. 2d 60, 665 N.W.2d 257 (discussing that departure from stare decisis occurs when a "prior decision is unsound in principle" and "may turn on whether the prior case was correctly decided" (first citing State v. Outagamie Cty. Bd., 2001 WI 78, ¶30, 244 Wis. 2d 613, 628 N.W.2d 376; then citing Planned Parenthood of S.E. Pa v. Casey, 505 U.S. 833, 999 (1992)(Scalia, J., concurring in part and dissenting in part))).

### 4. Effect

¶30 The second part of the intent-effects test requires us to examine the effect of the DNA surcharge statute. See Scruggs, 373 Wis. 2d 312, ¶39 (citing Hudson, 522 U.S. at 104). Regardless of the legislature's non-punitive intent for imposing the mandatory DNA surcharge, we consider whether it in effect operates as punishment. See id. Only the "clearest proof" will "override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." Hudson, 522 U.S. at 100. Seven factors guide our analysis of whether the mandatory DNA surcharge actually punishes the defendant: (1) does the statute involve an affirmative disability or restraint; (2) has the sanction at issue historically been regarded as punishment; (3) will the sanction be imposed only

17

after a finding of scienter; (4) does the statute promote the traditional aims of punishment——retribution and deterrence; (5) is the behavior to which it applies already a crime; (6) is there an alternative purpose to which it may be rationally connected; and (7) is the sanction excessive in relation to the alternative purpose assigned. See Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963).

¶31 We applied these seven factors in Scruggs and concluded only the fifth factor favors characterizing the mandatory surcharge as punitive. Scruggs, 373 Wis. 2d 312, ¶¶42-49. The same is true here.[10]

a. Is the surcharge an affirmative disability or restraint?

¶32 The State says the surcharge does not disable or restrain a defendant because it is not a form of imprisonment. Williams argues the surcharge imposes a disability on defendants, who are often indigent, by burdening them with "severe financial sanctions" "over and over, for each and every conviction." There is certainly no evidence in this case that the $250 surcharge disabled or restrained Williams in any way. He reported to the PSI writer that his girlfriend deposits $200/month in his prison account and another friend deposits $50 into his prison account "from time to time." In any event, "disability" and "restraint" are normally understood to mean imprisonment, which the $250 surcharge cannot effectuate. See

---

[10] The fifth factor is discussed under sub-heading "e."

18

LaCrosse v. Commodity Futures Trading Comm'n, 137 F.3d 925, 931 (7th Cir. 1998) (quoting Hudson, 522 U.S. at 104).

b.  Is the surcharge historically viewed as punishment?

¶33 In Scruggs, we determined that historically, a surcharge has not been viewed as punishment.  Scruggs, 373 Wis. 2d 312, ¶42.  Williams urges us to reconsider.  He claims our conclusion rested on a citation to Hudson, and Hudson relied on a citation to Helvering v. Mitchell, 303 U.S. 391 (1938), and Helvering relied on cases that all involved non-punitive remedial sanctions.  Williams distinguishes the surcharge from a remedial sanction because the latter involves "regulatory takings designed to reimburse the State for some perceived 'loss' owing to the 'defendant's' conduct" in contrast to the surcharge, which Williams contends is really a fine designed to punish the defendant.

¶34 We identify no historical evidence supporting Williams' characterization of a surcharge as punishment.  Although the surcharge might not align exactly with the remedial sanction cases from the late 1800s and early 1900s referenced in Helvering, a surcharge resembles a non-punitive remedial sanction much more than punishment.  See Williams, 377 Wis. 2d 247, ¶33 (Hagedorn, J., concurring) (listing examples of many other surcharges in our statutes "not denominated criminal fines, yet are assessed against convicted criminals or those subject to civil forfeitures").  The DNA surcharge is money paid to the State to offset the costs the State incurs in maintaining

19

the DNA databank, which exists only because defendants commit crimes.

### c.  Is a finding of scienter required?

¶35 Williams concedes that no finding of scienter is required to impose the surcharge.  The absence of the scienter requirement shows "the statute is not intended to be retributive." Kansas v. Hendricks, 521 U.S. 346, 362 (1997).

### d.  Does a surcharge promote retribution and deterrence?

¶36 We held in Scruggs the $250 surcharge was relatively small and therefore did not promote the traditional punitive aims of retribution and deterrence.  Scruggs, 373 Wis. 2d 312, ¶45.  The Fourth Circuit Court of Appeals reached the same conclusion regarding South Carolina's $250 DNA surcharge.  See In re DNA Ex Post Facto Issues, 561 F.3d 294, 300 (4th Cir. 2009) ("[T]he relatively small size of the fee also indicates that it was not intended to have significant retributive or deterrent value.").  Comparing the deterrent effect and retributive value (if any) of a $250 surcharge to the 17.5 year sentence Williams is serving buttresses this conclusion.  A $250 payment is unlikely to deter anyone from engaging in illegal activity.  And the corrective impact of a $250 fee pales in comparison to the penal power of a lengthy prison sentence.

### e.  Does the surcharge apply to conduct already a crime?

¶37 The State and Williams agree that the surcharge applies to conduct that was already a crime——namely, felony and misdemeanor convictions.  This factor weighs in favor of concluding that the surcharge operates as a punishment despite

20

the legislature's non-punitive intent.   The seven Mendoza-Martinez factors, however, are only "guideposts" and the list is "not exhaustive nor is any one factor dispositive."  Scruggs, 373 Wis. 2d 312, ¶41 (quoting Hudson, 522 U.S. at 99; citing Smith v. Doe, 538 U.S. 84, 97 (2003)).

### f.  Is the surcharge rationally connected to alternative purpose?

¶38 The text of Wis. Stat. § 973.046(3) explicitly broadcasts the non-punitive alternative purpose of the mandatory DNA surcharge statute by directing the use of the collected surcharges:  "All moneys collected" shall be "utilized under s. 165.77."  Wisconsin Stat. § 165.77 provides rules relating to collecting, analyzing, and maintaining DNA biological specimens. An alternative non-punitive purpose undoubtedly exists for the DNA surcharges.  The only question is whether the surcharge is rationally connected to the DNA database activities.  Judge Hagedorn aptly answers this question and we adopt his reasoning:

> The DNA databank is a crime-solving, crime-fighting public safety tool.  It supports law enforcement investigatory efforts and, in so doing, saves time, money, and resources that might be otherwise devoted. It serves criminal defendants who might be wrongly accused, or even worse, wrongly convicted.  In short, the DNA databank was expanded to further support, assist, and improve the administration of criminal justice in the state of Wisconsin.  The funding mechanism, then, must be seen in this light.  The legislature needed additional funds for this broader cause, and decided to place the burdens not on those necessarily required to give a sample, but on those convicted of crimes.  Policy merits aside, it is altogether rational to assess a fee aimed at solving crimes against those who commit them; at the very

21

> least, it is no less rational than the multitude of fees and surcharges that work exactly the same way.

_Williams_, 377 Wis. 2d 247, ¶41 (Hagedorn, J., concurring). The legislature created a "user fee" assessed against those responsible for necessitating the databank. The more crimes committed, the more times the user pays the fee. The law does not require the legislature to set a surcharge with precision; the surcharge imposed must bear only "an approximate relation to the cost it is meant to offset." _Scruggs_, 373 Wis. 2d 312, ¶46 (quoting _Mueller v. Raemisch_, 740 F.3d 1128, 1133 (7th Cir. 2014)). The costs from the DNA surcharge are meant to offset all of the expenses associated with DNA-database related activities. The user fees are reasonably connected to that non-punitive purpose. It makes sense to have those who "use" the criminal justice system more often——i.e., repeat offenders—— contribute more to offset the costs their actions generate.

### g. Is the surcharge excessive in relation to alternative purpose?

¶39 The State says the surcharge is not excessive. Williams disagrees and points to what he alleges is a substantial State surplus stemming from paid DNA surcharges. To determine whether the surcharge is excessive in relation to its non-punitive purpose, we must compare the amount of the surcharge with the overall expenses the State incurs because of the charged population's conduct. See _Mueller_, 740 F.3d at 1134-35; _Myrie v. Comm'r N.J. DOC_, 267 F.3d 251, 258 (3d Cir. 2001). The surcharge must be "grossly disproportionate to the annual cost" to prove it is excessive. _Mueller_, 740 F.3d at

22

1134; see also Myrie, 267 F.3d at 261.  We examine not "whether the legislature has made the best choice possible to address the problem it seeks to remedy," but "whether the regulatory means chosen are reasonable."  Smith, 538 U.S. at 105.

¶40 Under this standard, we are not convinced the surcharge is excessive in relation to the non-punitive purpose. As the State points out, DNA-related activities, including operating and maintaining a statewide database, are expensive. The money generated from the surcharges pays for all the DNA kits used to take samples from every person arrested for a felony and every person convicted of a misdemeanor.  The surcharges cover the salaries of the analysts employed to perform the DNA-related work.  For one year alone, the DNA testing kits cost over $1 million dollars.[11]

¶41  Citing a Legislative Fiscal Bureau report dated May 9, 2017, Williams says the excessive nature of the surcharges has resulted in a substantial surplus.  See Legislative Fiscal Bureau Paper #408, Crime Laboratory and Drug Law Enforcement Surcharge and DNA Surcharge Overview (May 9, 2017) (projecting a 2018-19 ending balance of $2,322,100).

¶42 We do not view Williams' argument as the "clearest proof" that the current surcharges are excessive in relation to the non-punitive purpose.  See Hudson, 522 U.S. at 100.  First,

---

[11] The State's attorney represented both in her brief and at oral argument that the DNA testing kits alone cost over $1 million annually.  Williams' attorney did not contest the State's figures.

the report Williams cites shows the DNA surcharge funds combined with the funds received from a separate surcharge.[12] It is impossible to discern which surcharge created the surplus. Second, the report reflects consistently declining revenue in the fund holding the DNA surcharges each budget year. Additionally, the law does not and cannot demand mathematical precision in setting and collecting just the right amount of surcharges necessary to fund the DNA databank. Multiple unknown variables——including the number of arrests, the amount of convictions, the volume of DNA related crimes, and the manpower needed to analyze the unknown——render the exact cost of operating the databank unpredictable year-to-year. Judicially requiring the legislature to enact annual revisions to the actual dollar amount of a DNA surcharge to adjust for less crime in one year and more crime in the next would encroach on legislative policy-making and create administrative havoc. Accordingly, the legislature must be given broad leeway to select a surcharge amount.

### 5. Summary

¶43 Applying the intent-effects test, we conclude the intent of the mandatory DNA surcharge was not punitive. Rather,

---

[12] The separate surcharge is identified as the "CLDLE" surcharge, which is the acronym for Crime Laboratory and Drug Law Enforcement. Joint Comm. On Fin., Legis. Fiscal Bureau, Paper #409, at 1 (Wis. 2017), https://docs.legis.wisconsin.gov/misc/lfb/budget/2017 19 biennal budget/050 budget papers/409 justice crime laboratory dna analysis kits.pdf (last visited May 17, 2018).

it was intended to fund the costs associated with the broad expansion of the DNA databank and all the activities related to it.  Likewise, a review of the precedential factors guiding our analysis shows that the mandatory DNA surcharge statute does not have a punitive effect.  Accordingly, the statute does not violate the Ex Post Facto Clauses.  Finally, we overrule Elward and Radaj, and we reverse the decision of the court of appeals in this matter as to the DNA surcharge.[13]  All three opinions incorrectly[14] held DNA surcharges to be unconstitutional ex post facto violations on the basis that the actual costs incurred for the individual convicted defendant had to be rationally connected to the non-punitive purpose.  This narrow approach failed to recognize the non-punitive purpose underlying the mandatory DNA surcharge:  to generate funds to cover costs incurred by the State in solving crimes utilizing a statewide DNA databank.

B.  Williams' Cross-Petition for Review——Sentencing

¶44 Williams contends the circuit court erroneously exercised its sentencing discretion by relying on an improper factor.  More specifically, Williams claims the circuit court imposed a harsher sentence because Williams refused to agree to

---

[13] As noted in part B., we affirm the court of appeals' decision in this case on the sentencing issue.

[14] We recognize the court of appeals in this case was bound to follow State v. Elward, 2015 WI App 51, 363 Wis. 2d 628, 866 N.W.2d 756, and State v. Radaj, 2015 WI App 50, 363 Wis. 2d 633, 866 N.W.2d 758.  See Cook v. Cook, 208 Wis. 2d 166, 189-90, 560 N.W.2d 246 (1997).

25

pay restitution. Williams argues that he has a right to object to paying restitution and successfully doing so should not cause a sentencing court to increase his sentence. The State responds that: (1) the circuit court did not actually rely on Williams' unwillingness to pay restitution; (2) even if it did, this was not an improper factor; and (3) any error was harmless. We hold the circuit court may refer to a defendant's failure to voluntarily pay restitution when the reference is directly linked to a proper sentencing factor. Because the circuit court's reference to restitution at Williams' sentencing was directly linked to a proper sentencing consideration——Williams' lack of remorse——the sentencing court did not erroneously exercise its discretion.

### 1. Standard of Review & Applicable Law

¶45 We will not disturb a sentencing decision unless the circuit court erroneously exercised its discretion. State v. Alexander, 2015 WI 6, ¶16, 360 Wis. 2d 292, 858 N.W.2d 662. A circuit court erroneously exercises its discretion in imposing a sentence if it "actually relies on clearly irrelevant or improper factors." Id., ¶17 (quoting State v. Harris, 2010 WI 79, ¶66, 326 Wis. 2d 685, 786 N.W.2d 409); see also McCleary v. State, 49 Wis. 2d 263, 274-76, 182 N.W.2d 512 (1971). To establish error, a defendant must prove by clear and convincing evidence that a circuit court relied on improper factors. Alexander, 360 Wis. 2d 292, ¶17. A defendant must prove both that the factor was improper and that the circuit court actually relied on it. Id., ¶¶18-27.

26

¶46 There are three main factors circuit courts must consider in determining a defendant's sentence: (1) the gravity of the offense; (2) the character of the defendant; and (3) the need to protect the public. Id., ¶22. The circuit court may also consider secondary factors, including:

> (1) Past record of criminal offense; (2) history of undesirable behavior pattern; (3) the defendant's personality, character and social traits; (4) result of presentence investigation; (5) vicious or aggravated nature of the crime; (6) degree of the defendant's culpability; (7) defendant's demeanor at trial; (8) defendant's age, educational background and employment record; (9) defendant's remorse, repentance and cooperativeness; (10) defendant's need for close rehabilitative control; (11) the rights of the public; and (12) the length of pretrial detention.

Id., ¶22 (quoted sources omitted). When imposing sentence, a circuit court cannot rely on inaccurate information, race or national origin, gender, alleged extra-jurisdictional offenses, or the defendant's or victim's religion. Id., ¶¶18, 23. In addition, a circuit court may not impose "a harsher sentence solely because [a defendant] availed himself of one of his constitutional rights," Buckner v. State, 56 Wis. 2d 539, 550, 202 N.W.2d 406 (1972) (emphasis added), or vindictively impose a harsher sentence when a defendant has succeeded in getting his first sentence vacated or overturned by exercising his appellate rights, State v. Church, 2003 WI 74, ¶¶1, 28-39, 262 Wis. 2d 678, 665 N.W.2d 141.

¶47 Outside of these prohibitions, the circuit court has "wide discretion in determining what factors are relevant" and

27

what weight to give to each factor. State v. Gallion, 2004 WI 42, ¶68, 270 Wis. 2d 535, 678 N.W.2d 197.

## 2. Application

¶48 There is no dispute that the circuit court considered the three primary sentencing factors. It noted the serious nature of the crime, addressed both positive and negative factors regarding Williams' character, and discussed the need to protect the public. We therefore turn our attention to whether Williams proved by clear and convincing evidence that the circuit court actually relied on an improper factor when imposing sentence.

### a. Is a position on restitution an improper factor?

¶49 Williams insists that a sentencing court cannot consider a defendant's successful objection to paying restitution. He argues that because he has a statutory right to challenge restitution, it is improper for the circuit court to use his successful challenge as an aggravating factor against him. He also contends that successful restitution challenges do not reflect a lack of remorse. Although we agree with Williams that a sentencing court should not vindictively increase a defendant's sentence based solely on his decision to challenge restitution, see Church, 262 Wis. 2d 678, ¶28; Buckner, 56 Wis. 2d at 550, Williams fails to demonstrate by clear and convincing evidence that his position on restitution was an improper sentencing factor.

¶50 The circuit court's discussion regarding restitution did not stand alone as an independent factor in the sentencing

28

transcript. Rather, the circuit court's sole reference to restitution came toward the end of the circuit court's sentencing remarks and was intertwined with its consideration of Williams' character and lack of remorse, as evidenced only in part by Williams' position that he was not responsible for restitution. It is important to note the theme permeating both the PSI report and the sentencing remarks——Williams was not sorry that his actions caused the death of another human being. The PSI writer described Williams' lack of remorse as "atrocious" and emphasized Williams' attitude that his crime had nothing to do with R.W.'s death. The prosecutor and the defense lawyer both focused on remorse. Williams' remorse, or lack thereof, dominated the sentencing hearing. While a defendant's position on paying restitution is not listed among the primary or secondary sentencing factors, his lack of remorse, evidenced by his attitude regarding restitution, certainly can be relevant to sentencing considerations.

¶51 Sentencing courts may not vindictively punish a defendant solely for exercising a constitutional right.[15] Alabama v. Smith, 490 U.S. 794, 798-801 (1989); Church, 262 Wis. 2d 678, ¶¶28-39. But when the restitution factor is

---

[15] To be clear, Williams' right to challenge restitution arises from our statutes, not the constitution. See Wis. Stat. § 973.20(13)(c); Canady, 234 Wis. 2d 261, ¶9. Defendants do, however, have a constitutional due process right not to be sentenced based on improper factors upon which a court actually relies. See State v. Harris, 2010 WI 79, ¶33, 326 Wis. 2d 685, 786 N.W.2d 409.

29

inextricably intertwined with a defendant's character and lack of remorse, its consideration is proper. The restitution factor at issue here was not Williams' decision to challenge restitution, or the fact that his challenge was successful, but rather Williams' disavowal of responsibility for R.W.'s death and unwillingness to contribute to funeral costs. Williams showed no insight that his choice to drive to the drug buy, despite his brother's possession of a gun and his brother's armed robbery plan, resulted in R.W.'s death. Under these circumstances, Williams failed to convince us that the sentencing court's single reference to restitution constituted an improper factor.

### b. Actual reliance

¶52 Our conclusion that the circuit court's restitution remark did not constitute an improper sentencing factor disposes of Williams' cross-petition. For the sake of completeness, we briefly address the actual reliance issue. In determining whether a circuit court actually relied on an improper sentencing factor, we review the sentencing transcript as a whole and consider the allegedly improper comments in context. Harris, 326 Wis. 2d 685, ¶45. Actual reliance occurs only when the circuit court paid "explicit attention" to an improper factor, and when the improper factor formed the "basis for the sentence." Alexander, 360 Wis. 2d 292, ¶25.

¶53 The circuit court's remarks as a whole did not concentrate explicit attention on Williams' decision to challenge restitution. Rather, the sentencing remarks

demonstrate the circuit court focused on the three primary sentencing factors, as well as Williams' clear lack of remorse.[16] The basis of this sentence was not Williams' decision to challenge restitution but rather the seriousness of the offense, Williams' poor character as evidenced by his lack of remorse, and the need to protect the public. The sole reference to restitution bore a reasonable nexus to the relevant factor of Williams' lack of remorse. In context, the circuit court in no way tied the length of the sentence to Williams' exercise of his statutory right to challenge restitution. See Harris, 326 Wis. 2d 685, ¶¶4, 59, 67 (ruling actual reliance not proven when improper factors "bear a reasonable nexus to proper sentencing factors"). Nothing in the transcript suggests the circuit court increased Williams' sentence solely because he challenged restitution. Accordingly, Williams failed to establish actual reliance.

## III. CONCLUSION

¶54 We hold the mandatory DNA surcharge statute is not an ex post facto law because the surcharge is not punishment under the intent-effects test. The legislature intended the surcharges to offset the costs associated with its broad expansion of the statewide DNA databank, and the effect of the

---

[16] The circuit court's decision suggests it saw Williams' last minute expression of remorse as gamesmanship and did not believe him. Even in his attempt to be remorseful, Williams focused on himself and losing his son by going to prison.

surcharges do not override the legislature's non-punitive intent.

¶55 In addressing ex post facto challenges, our court of appeals in this case was bound to apply Elward and Radaj, which erroneously required the DNA surcharge to represent the particular costs associated solely with a single defendant in order to be declared non-punitive. We overrule these cases because each is wrongly decided and based on faulty reasoning. The legislature's non-punitive purpose for the mandatory DNA surcharge was much broader; in essence it serves as the funding mechanism for a DNA databank that operates as a crime-solving and crime-fighting public safety tool. The surcharge covers DNA-related expenses, including the costs of all the kits and tests not only for those convicted, but also for those who are only arrested for committing (or attempting to commit) a felony.[17] The surcharges are also used to pay salaries of DNA analysts who maintain the databank as well as those who gather, process, and analyze DNA samples and DNA evidence.

¶56 We also hold the circuit court did not erroneously exercise its discretion when it referenced restitution during its sentencing remarks. The single restitution reference was intertwined with remarks about Williams' lack of remorse, a proper sentencing factor. The restitution remark focused on Williams' failure to accept responsibility for causing one

---

[17] See supra n.9.

32

victim's death rather than Williams' right to challenge restitution.  Williams failed to prove by clear and convincing evidence that the sentencing court relied on an improper sentencing factor.

¶57 Accordingly, we reverse that part of the court of appeals decision concluding the mandatory DNA surcharge statute operated as an ex post facto violation, and we reinstate the $250 surcharge as part of Williams' judgment.  We affirm that part of the court of appeals decision holding the circuit court properly exercised its sentencing discretion when it sentenced Williams.

*By the Court.*—The decision of the court of appeals is reversed in part and affirmed in part.

¶58 PATIENCE DRAKE ROGGENSACK, C.J., and ANN WALSH BRADLEY, J., did not participate.

¶59 SHIRLEY S. ABRAHAMSON, J. *(concurring).* I largely agree with the analysis of the majority opinion, and I concur in the mandate.

¶60 Nonetheless, I am concerned with the majority's discussion of the court of appeals' decision in State v. Radaj.[1] Specifically, I disagree with the majority's suggestion that there is never a circumstance under which the mandatory DNA surcharge would be considered punishment.[2]

I

¶61 Under the second part of the "intent-effects" test, the court determines whether the mandatory DNA surcharge has a punitive effect despite its non-punitive intent.[3] Seven factors guide the analysis of whether the mandatory DNA surcharge actually punishes a particular defendant. Among the seven factors are (1) whether the surcharge promotes the traditional aims of punishment——retribution and deterrence; and (2) whether the sanction is excessive in relation to the alternative, non-punitive purpose assigned to the sanction.[4]

¶62 Under the mandatory DNA surcharge statute in effect when Williams was sentenced (and still in effect today), circuit courts are required to impose upon defendants a surcharge of

---

[1] State v. Radaj, 2015 WI App 50, 363 Wis. 2d 633, 866 N.W.2d 758.

[2] See majority op., ¶38.

[3] State v. Scruggs, 2017 WI 15, ¶39, 373 Wis. 2d 312, 891 N.W.2d 786.

[4] Id., ¶41.

1

$200 per misdemeanor conviction and $250 per felony conviction.[5] There is no maximum DNA surcharge, and because the surcharge is calculated on a per-conviction basis, the DNA surcharge varies from case to case.

¶63 In Radaj, the defendant pleaded guilty to four felonies. As required by the mandatory DNA surcharge statute, the circuit court imposed a $1,000 DNA surcharge (i.e., $250 per felony conviction).[6] The court of appeals held that the $1,000 DNA surcharge violated the Ex Post Facto Clauses of the Wisconsin and United States Constitutions because the surcharge was "not rationally connected and [was] excessive in relation to the surcharge's intended purpose, and that its effect [was] to serve traditionally punitive aims."[7]

¶64 The court of appeals in Radaj incorrectly assumed that the purpose of the mandatory DNA surcharge statute was to reimburse the government for the cost of "DNA-analysis-related activities" incurred in relation to a particular defendant's prosecution.[8] In State v. Scruggs,[9] this court explained that

---

[5] Wis. Stat. § 973.046(1r)(a) (2013-14). When Williams committed the felony in the instant case, the DNA surcharge was discretionary, could only be imposed for a felony conviction, and could not exceed $250. Wis. Stat. § 973.046(1g) (2011-12).

[6] Like Williams, the defendant in Radaj committed his crimes when the surcharge was discretionary but was sentenced when the surcharge was mandatory.

[7] Radaj, 363 Wis. 2d 633, ¶35 (emphasis added).

[8] See id., ¶30.

[9] State v. Scruggs, 2017 WI 15, 373 Wis. 2d 312, 891 N.W.2d 786.

2

the mandatory DNA surcharge statute serves as a funding mechanism for broad expansions to the government's DNA database, including additional costs associated with collecting, analyzing, and maintaining DNA samples of those convicted of misdemeanors and those arrested for, but not convicted of, felonies.[10] Thus, the majority correctly overrules Radaj for having mistakenly conducted its intent-effects analysis with a misunderstanding of the broader funding purpose of the mandatory DNA surcharge statute.

¶65 However, the majority goes too far by suggesting that a DNA surcharge could never be considered punishment under any set of circumstances.[11]

¶66 In the instant case, Williams was convicted of only one felony. The court does not have before it a defendant with multiple felony convictions as the court of appeals did in Radaj.

¶67 The majority should reserve judgment on whether a DNA surcharge can ever be so expensive that it constitutes punishment under the facts of a particular case. Without knowing what the DNA surcharge actually is in a particular case, how can a court determine whether the surcharge promotes the

---

[10] Id., ¶47.

[11] See majority op., ¶38 (characterizing the per-conviction method of calculating a DNA surcharge as a "user fee" in which "[t]he more crimes committed, the more times the user pays the fee").

traditional aims of punishment?[12]   How can a court determine whether the surcharge is excessive in relation to the non-punitive purpose assigned to the mandatory DNA surcharge statute without knowing what the DNA surcharge actually is?[13]   Because of the variable nature of the DNA surcharge, these questions must be answered on a case-by-case basis.

II

¶68 The majority appears to have again reached beyond the issues presented in order to answer a question not raised by the facts of the case before it.[14]   Due process and judicial restraint counsel against deciding an issue that was not briefed or argued by the parties.

¶69 For the foregoing reasons, I do not join the opinion but concur only in the mandate.

---

[12] See majority op., ¶36 (relying on Williams' single $250 surcharge to conclude that the surcharge does not have a retributive or deterrent effect).

[13] See majority op., ¶¶39-42 (engaging in a fact-specific analysis of whether Williams' single $250 surcharge is excessive in relation to the broad funding purpose of the mandatory DNA surcharge statute).

[14] See Springer v. Nohl Elec. Prods. Corp., 2018 WI 48, ___ Wis. 2d ___, ___ N.W.2d ___ (Abrahamson, J., dissenting).

4